IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROGELIO HAMILTON RANGEL,

    Plaintiff,                        No. CIV S-02-1633 GEB PAN P

    vs.

DR. DEEPAK MEHTA,[1]

    Defendant.                      FINDINGS & RECOMMENDATIONS

_____/

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that defendant violated his rights under the Eighth Amendment by acting with deliberate indifference to his serious medical need for treatment of prostate cancer. This matter is before the court on defendant's motion for summary judgment.

        SUMMARY JUDGMENT STANDARDS UNDER RULE 56

        Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

        Under summary judgment practice, the moving party

---

[1] Dr. Mehta was the only defendant served in this action. (See Orders filed December 9, 2002 and January 8, 2003.)

1

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On January 8, 2003, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

/////

ANALYSIS

I. Undisputed Facts

Plaintiff is incarcerated at California Medical Facility, Sacramento ("CMF"). Defendant Dr. Mehta was employed by the California Department of Corrections Rehabilitation as a physician and surgeon, assigned to work at CMF. Plaintiff was born March 26, 1923, is 83 years old, has a hearing disability[2], and does not understand English well.

On May 22, 2001, defendant Dr. Mehta examined plaintiff and noted that plaintiff had elevated Prostate-Specific Antigen ("PSA") test levels which might indicate the presence of cancer or other serious health problems. Based on the results of the examination, Dr. Mehta referred plaintiff to a specialist, Dr. Athanassious.

Dr. Mehta is not an oncologist or cancer specialist.

On August 2, 2001, N. Athanassious, M.D., performed a cystoscopy and needle biopsy of the prostate gland. (Pl.'s February 13, 2006 filing at 6.) Plaintiff was diagnosed as having cancer of the prostate gland. (Id.)

II. Plaintiff's Claims

Plaintiff claims that defendant Mehta violated his rights under the Eighth Amendment by acting with deliberate indifference to his need for adequate treatment of prostate cancer. Defendant seeks summary judgment on the ground that there is no evidence he was deliberately indifferent to plaintiff's need for treatment of alleged prostate cancer.

To prevail on his Eighth Amendment claims based on deliberate indifference to his medical need for treatment of prostate cancer, plaintiff must show that defendants acted with deliberate indifference to serious medical needs. See Farmer v. Brennan, 511 at 825. Deliberate indifference may be shown "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical

---

[2] See Pl.'s August 15, 2005 Exhibits, Ex. O-32; O-61.

4

care." Hutchinson v. U.S., 838 F.2d 390, 394 (9th Cir. 1988).  Where the claim is based on a delay in treatment, "a prisoner can make 'no claim for deliberate medical indifference unless the denial was harmful.'" McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir.1997) (en banc) (quoting Shapley v. Nevada Board of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)(per curiam)).  The harm caused by the delay need not, however, be "substantial." McGuckin at 1060 (citing Wood v. Housewright, 900 F.2d 1332, 1339-40 (9th Cir. 1990); also citing Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 998-1000 (1992)).  Mere differences of opinion between a prisoner and prison medical staff as to appropriate medical care do not give rise to a § 1983 claim.  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

PLAINTIFF'S AMENDED COMPLAINT[3]

Plaintiff's November 20, 2002 verified complaint alleges that defendant has failed to provide him treatment, i.e., surgery or radiation, for prostate cancer since 1994 or 1995.  The complaint alleges "deliberate indifference" under the Eighth Amendment and seeks court-ordered care, injunctive relief and damages.

Medical records appended to plaintiff's complaint prior to 2001 are discussed in this section.  Medical records for the time frame 2001 to the present will be addressed in the motion for summary judgment section infra.

Plaintiff's Prostate-Specific Antigen ("PSA") test from a sample collected on June 23, 1998 was 9.7.  (November 20, 2002 amended complaint, attachment.)  On October 15, 1998, Dr. Wang requested that a transrectal prostate ultrasound and needle biopsy be performed on plaintiff.  (Id.) Plaintiff was referred to the urology clinic on January 15, 1999; notes taken by
/////

---

[3] Plaintiff's original complaint was filed on August 1, 2002.  By order filed January 8, 2003, the court directed that plaintiff's November 20, 2002 supplemental complaint be filed, and held the amended complaint superseded plaintiff's original complaint.  (Docket No. 15.)

5

Dr. Bayubay reflect plaintiff had been approved for a needle biopsy of the prostate on October 15, 1998, and plaintiff was still waiting for the procedure.  (Id.)

On March 18, 1999, a prostate biopsy was performed.  The Surgical Pathology Report from the March 18, 1999 prostate biopsy provided the following microscopic diagnosis:

> 1. Fibromuscular hyperplasia and focal glandular atrophy.  No tumor seen.
>
> 2. Focal chronic prostatitis.

(Id.)  On April 28, 1999, plaintiff's PSA was 10.22.  (Id.)  Progress notes dated May 11, 1999, reflected plaintiff had a prostate needle biopsy in March of 1999.  Plaintiff's PSA was 10.36 on May 21, 1999 and June 2, 1999.  (Id.)  On June 2, 1999, plaintiff was seen in the B1 Clinic by Dr. Bill Burr, who noted a possible diagnosis of cancer of the prostate and referred plaintiff to Dr. Wang.  (Id.)  Plaintiff's PSA was reported to be 10.36 on September 13, 1999.  (Id.)  In that consultant's record, Dr. Athanassious noted plaintiff's prior PSA levels of 9.89 on 8/17/99 and 9.7 on 8/19/99, but stated the elevated PSA levels were "probably secondary to BPH."[4]  (Id.)

These early medical records do not reflect that Dr. Mehta was plaintiff's treating doctor and the biopsy performed March 18, 1999 did not reveal cancer of the prostate.  Thus, Dr. Mehta is entitled to summary judgment on the issue of whether medical treatment for prostate cancer was delayed or denied from 1994 to 1999.

Plaintiff's opposition to the motion for summary judgment consisted of the following five sentences:

> Please take notice that plaintiff Rogelio H. Rangel hereby files his formal response to the defendant's motion for summary judgment and memorandum of points and authorities.  Plaintiff Rogelio H. Rangel hereby formally objects to the defense motions for summary judgment and there of any other motion.  This objection is based on the following evidence that plaintiff Rogelio Hamilton Rangel is attaching to objection motion.  Plaintiff firmly believes once this court has review[ed] the vital document the court will

---

[4] BPH is an acronym for benign prostatic hypertrophy.

> agree with plaintiff and then deny the defendant's motion for summary judgment and precede on with this action accordingly.
> 'See attached documentation.'

(Pl.'s February 13, 2006 Opp'n at 1.)  Plaintiff then signed the opposition under penalty of perjury.[5]  Plaintiff attached to his opposition a document entitled "Production of Documents and Answer to Interrogatories."  Plaintiff declares that defendant Dr. Mehta "failed to provide surgery to remove the cancer, or whatever, medical procedure is necessary to prevent the growth of cancer."  (Pl.'s February 13, 2006 Production at 2.)  Plaintiff states Dr. Mehta "acted with deliberate indifference to plaintiff's medical needs by not treating the findings made by Dr. Athanassious."  (Id.)  Plaintiff contends that further tests are not an appropriate remedy for prostate cancer.  As noted above, Dr. Athanassious diagnosed plaintiff with cancer of the prostate gland on August 2, 2001.  (Pl.'s May 5, 2006 Ex. A-8.)

In addition, on August 16, 2005, plaintiff submitted his file of medical records in support of his claims.[6]  The earliest medical record reflecting treatment by Dr. Mehta is dated June 24, 2001.  (Ex. X-92.)  A review of these medical records reflect the following.

On June 24, 2001, plaintiff was evaluated for his status post heart surgery by Scott T. Anderson, M.D., Physician and Surgeon.  (Exs. 0-60-62.)  Following the first page of that Health Record Report, there is a page two of a "Discharge Summary," with "Hospital Course, continued," at the top.  (Ex. O-62.)  That page two is signed by defendant D. Mehta, M.D., Physician and Surgeon.  (Ex. O-62.)  Dr. Mehta noted that plaintiff had a

> radionuclide bone scan as part of his prostatic work-up.  Report from the community hospital dated July 31, 2001 noted increased

---

[5] On August 15, 2005, plaintiff submitted his trial exhibits, which appear to include copies of his medical records.  (Docket No. 67.)  On May 5, 2006, plaintiff filed the exhibits he referenced in his opposition to the instant motion.  (Docket No. 83.)  The court has reviewed all of these exhibits.

[6] It appears no medical records were submitted for the year 2000.  One medical record from 1999 was included in plaintiff's August 16, 2005 filing, which was Dr. Burr's report dated June 8, 1999.  (Ex. P-250.)  Dr. Burr's report is discussed in the earlier medical record discussion at page 6, supra.

7

> radiotracer uptake within the skull and T12 vertebral body. This could be from prostatic pathology, Paget's disease, or metastasis. Considering the patient's symptomatology he could have Paget's disease without any specific symptoms related to the findings.

(Ex. O-62.) Dr. Mehta noted the following in the Assessment and Plan:

> 4. Benign prostatic hypertrophy. He will continue to take Terazosin at current doses, which can be gradually increased every week up to 16 mg. maximum. He will require surgical intervention in the near future, which will be followed by the urologist.

(Ex. O-62.) This particular page two, which was apparently misplaced, contains no date. (Id.) Plaintiff was referred to urology and was examined by Dr. Nabil Athanassious on July 6, 2001. (Ex. O-66.)

The admissions records for plaintiff's June 18, 2001 admission to Queen of the Valley Hospital states that Harry Dassah, M.D., was plaintiff's primary care physician. (Ex. O-74.) Dr. Dassah is a cardiologist. However, a hospital record dated June 29, 2001, states Dr. Mehta was plaintiff's physician. (Ex. O-103.) While other doctors treated plaintiff in June of 2001, Dr. Mehta was the physician who most frequently treated plaintiff in 2001 and 2002. (Exs. O-86; O-98; O-103; O-105; O-107-8; O-136; O-142; O-149; O-122-24; O-127-31; O-150-53; O-155; O-157; O-189; O-199-201; O-204; X-5-6; X-8-9; X-12; X-25; X-032; X-34-35; X-39; X-45; X-49; X-57; X-62-63; X-65-67; X-69; X-74; X-92-93; X-96-98; X-102-03; & X-105.)

On July 25, 2001, radiology performed a CT scan of plaintiff's abdomen and pelvis based on "prostatic hypertrophy, with elevation of PSA." (Ex. 252.) The radiologist concluded that plaintiff had a "[l]arge renal cyst and very enlarged prostate gland with Foley catheter and penile prosthesis. No metastatic disease, adenopathy, or acute process is identified." (Ex. 252.)

On August 13, 2001, Dr. Mehta diagnosed plaintiff with BPH and increased his prescription for Terazosin. (Ex. X-18.) Dr. Mehta signed a health record report for plaintiff, which was dictated on August 17, 2001, and stated that plaintiff had been admitted on June 24,

1  2001 and discharged on August 17, 2001.  (Ex. X-98.)  Dr. Mehta stated plaintiff was admitted

2  "post re-do coronary artery bypass graft performed at a community hospital by Dr. Klingman."

3  (Ex. X-98.)  Dr. Mehta stated plaintiff had

> significant prostatic pathology dating to 1994 when he first had elevation of his PSA.  He had a repeat cystoscopy and prostatic biopsy which returned negative for cancer of the prostate.  He had significant elevation of PSA up to 49.52 on July 3rd, which declined to 10.27 on August 1st.  This could be an effect of increasing the doses of medications he is receiving in the form of terazosin.  His symptoms are suggestive of prostatic hypertrophy, for which he has been put on progressively increasing doses of the alpha blocker terazosin which he would continue up to the maximum dose of 16 mg. per day.  In the interim the patient had two trials of removal of his Foley catheter, which he could not tolerate without retention of urine, but the catheter was reinserted.
>
> Complete blood count from August 1, 2001 returned with a hemoglobin of 13.1 and hematocrit 39.8, which is suggestive of grade 1 anemia.  This could be a combination of the recent bypass surgery and red blood cell leak from the catheter.  Chemistries from August 1st returned with normal findings except raised alkaline phosphatase at 264 and glucose of 135 high.  This is most likely from the prostatic tissue.

(Ex. X-98; Pl.'s May 5, 2006 Ex. A-26.)

On August 28, 2001, Dr. Dhillon, physician/surgeon signed a consulting service request form.  (Pl.'s May 5, 2006 Ex. A-39.)  It appears that on December 4, 2001, Dr. Athanassious consulted on plaintiff's case and recommended an urgent cystoscopy be performed.  (Pl.'s May 5, 2006 Ex. A-39.)

On January 2, 2002, a cystoscopy was performed by Dr. Athanassious, Chief, Department of Surgery, who found "the presence of a benign prostatic hypertrophy, trilobar enlargement of about 50 gm was confirmed.  The prostate gland was occluded and the bladder was trabeculated grade 3 with very small capacity."  (Ex. P-108.)  On January 4, 2002, plaintiff was assessed as having "retention of urine secondary to prostato megaly."  (Ex. P-105.)  Dr. Athanassious noted plaintiff agreed to have the surgery.  (Ex. P-105.)

/////

On January 28, 2002, a radionuclide bone scan was performed on plaintiff based on his elevated PSA and large prostate gland and abnormal bone scan performed on July 31, 2001. (Ex. X-112.) The conclusion rendered was:

> The intense radiotracer uptake within the skull and T12 vertebral body is unchanged. The stability is more suggestive of Paget's Disease or less likely fibrous dysplasia. Metastic carcinoma would be less likely but cannot be excluded with certainty. Clinical correlation is recommended.

(Ex. 112.)

On January 7, 2003, plaintiff presented with BPH and Foley. (Ex. P-44.) Plaintiff "request[ed] TURP to get rid of Foley."[7] (Ex. P-44.) Dr. Athanassious reported that plaintiff's PSA was stable at 9.89 and 8.67 and referred plaintiff for TURP surgery. (Ex. P-44.) On February 18, 2003, plaintiff was seen in the oncology clinic for a repeat PSA testing and was calendared for return in three months. (Ex. P-76.) Plaintiff was seen by Dr. Steven on October 9, 2003. (Ex. P-77.) Plaintiff was again seen in oncology on November 18, 2003, further blood tests were ordered and plaintiff was directed to return in three months. (Ex. P-78.)

On March 19, 2003, Dr. Mehta asked plaintiff "why do you refuse surgeries?" (Ex. P-90.) Plaintiff responded by stating "I do not say you do the surgery, I always agree with surgery or radiation." (Ex. P-90.) On May 20, 2003, plaintiff told the referring physician he wanted surgery. (Ex. P-45.) However, on May 20, 2003, Dr. Mehta noted "patient has changed his mind frequently regarding surgery." (Ex. P-87.)

On June 2, 2003, plaintiff allegedly refused to sign a form documenting his refusal to receive prostate surgery and biopsy.[8] (Ex. P-48; P-52; P-86.) On July 28, 2003, plaintiff was consulted again, this time through an interpreter and the doctor again noted plaintiff refused treatment. (Ex. P-50.) The accompanying refusal form, marked "patient refuses to sign," was for

---

[7] TUR is an acronym for transurethral resection of the prostate, and is also referred to as "TURP."

[8] Plaintiff has written "FALSE" across this document.

a cysto and needle biopsy of the prostate.[9] (Ex. P-51.) Dr. Athanassious noted he explained surgery for BPH, including TUR, and the risks and benefits, complications, urinary incontinence, recurrence, erectile impotence and risks due to plaintiff's age. (Ex. P-62.) Plaintiff was also informed that only a percentage of patients get complications. (Ex. P-62.) Plaintiff refused treatment and refused to sign the form. (Ex. P-62.)

On November 10, 2003, it was noted that plaintiff had refused TURP in the past, but that he verbally agreed to be rescheduled. (Ex. P-81.) On November 21, 2003, plaintiff signed a form declaring he did not want prostate surgery done at CMF. (Ex. P-48.)

On January 7, 2004, Dr. Master at UCSF Medical Center at Mount Zion wrote a letter to Dr. Andreasen at CMF concerning plaintiff. Dr. Master recounted plaintiff's pertinent medical history as follows:

> history of acute urinary retention requiring a Foley catheter since June of 2001 who also has an elevated PSA of 9.99. Of note, the patient additionally has a history of near deafness, coronary artery disease, hypertension, and Paget's disease.

(Pl.'s Ex. P-219.) Dr. Master noted plaintiff was at UCSF for

> evaluation and treatment of his elevated PSA as well as dealing with urinary retention. I am able to see in the chart that the patient did have a needle biopsy of the prostate which was apparently negative. This was performed in approximately 2002 or 2003. He was initially on the schedule at the California Medical Facility for a TUR,[10] but apparently did refuse.

(Pl.'s Ex. P-219.) Dr. Master noted plaintiff's PSA on 7/31/03 was 9.99 and his last PSA was 8.53 on 4/30/03. (Id.) Dr. Master noted an imaging evaluation:

> Significant for a bone scan performed 1/28/02 and is compared to a bone scan performed on 7/31/01 that shows evidence of Paget's disease as opposed to a metastatic prostate cancer process.

---

[9] Plaintiff has marked this document "FALSE" as well.

[10] TUR is an acronym for transurethral resection of the prostate.

11

(Pl.'s Ex. P-220.) Dr. Master's 2004 overall assessment and recommendation was:

> This is an 80-year-old man with two genitourinary problems.
>
> 1. FAILURE TO EMPTY: The patient does have a catheter in place. He is being managed with this but has been offered a TURP in the past. Apparently, the patient has refused this in the past. I feel that if we were to proceed with this, I would like to perform a cystoscopy first to get a sense of what his failure to empty due to.
>
> 2. ELEVATED PSA: The patient does have an elevated PSA. It seems likely that the catheter was in place at the time this PSA was drawn, however, the catheter has been in place since 2001 and apparently he has had evidence of a rising PSA in 2003.
>
> Given the fact that the prostate exam shows a rock hard prostate, I think it is appropriate to perform an ultrasound guided needle biopsy, and we will schedule him for this.

(Pl.'s Ex. P-220 (docket no. 67-14 at 8-9).) In February of 2004, Dr. Calvin S. Steve noted that plaintiff told him the 2001 biopsy showed cancer of the prostate and he has been waiting for surgery. (Ex. P-5.) Dr. Steven suggested referral to urology, but plaintiff had a personal conflict there and he declined, opting to wait for the court's decision. (Ex. P-5.)

On March 2, 2004, plaintiff refused to have another prostate biopsy, ordered by Dr. Masters, because "he wanted prostate surgery and not a biopsy because he already had a biopsy done by Dr. Athanassious." (Ex. P- 20.)

On March 4, 2004, plaintiff was seen by Dr. Richman in oncology. (Ex. P-4.) Dr. Richman noted plaintiff's recent PSA levels were stable at 9-10. (Ex. P-4.) Plaintiff told Dr. Richman plaintiff had been told he did not need surgery. (Ex. P-4.)

On August 6, 2004, plaintiff refused treatment by Dr. Athanassious. (Ex. P-13.) On November 9, 2004, Dr. Athanassious referred plaintiff to a consultant urologist noting that plaintiff "has personal conflict with me. He is best served by outside referral." (Ex. P-12.)

As noted above, plaintiff can prevail on his Eighth Amendment claim against defendant Mehta only if he can prove that defendant Mehta acted with deliberate indifference to a

/////

serious medical need.  Under the circumstances of this case, plaintiff cannot make the necessary showing.

The medical records provided by plaintiff indicate there were conflicting diagnoses surrounding plaintiff's elevated PSA levels.  Specifically, in addition to his other medical problems such as heart problems and Paget's Disease, plaintiff has been diagnosed with prostatic hypertrophy and chronic prostatitis.  Plaintiff argues that Dr. Mehta's order of a repeat biopsy was evidence of deliberate indifference in that Dr. Mehta didn't treat plaintiff for the prostate cancer Dr. Athanassious diagnosed.  However, the fact that the repeat biopsy returned negative for cancer supported the repeat biopsy in the sense that a doctor would order a second test to ensure the first test results were accurate.  Indeed, plaintiff's 1999 biopsy revealed a diagnosis of "Fibromuscular hyperplasia and focal glandular atrophy, no tumor seen" and "Focal chronic prostatitis." (November 20, 2002 amended complaint, attachment.)  Although Dr. Athanassious diagnosed plaintiff with prostate cancer on August 2, 2001, a repeat biopsy came back negative.  (Ex. X-98.)  In light of that negative result, Dr. Mehta could not be deliberately indifferent by failing to treat prostate cancer.

Plaintiff argues that the August 17, 2001 medical record demonstrates Dr. Mehta contended plaintiff was cured of cancer, but Dr. Mehta did not make such a broad finding. (Pl.'s May 5, 2006 Ex. A-26.)  Dr. Mehta reported that the repeat cystoscopy and prostatic biopsy returned negative for cancer of the prostate.  (Id.)  However, Dr. Mehta attributed the elevated PSA levels to an increased dosing of terazosin.  While plaintiff may contend that his elevated PSA results were attributable to prostate cancer, it appears Dr. Mehta's opinion was the long term elevation of plaintiff's PSA levels could be attributable to BPH.  This difference of opinion would not give rise to a § 1983 claim.  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

/////
/////
/////

Moreover, the records demonstrate that plaintiff was referred to a specialist, Dr. Athanassious, who provided plaintiff with follow-up care.[11]  Plaintiff has provided no evidence that he attempted to see or be treated by Dr. Mehta after June 17, 2001 for prostate cancer and plaintiff has provided no evidence to dispute defendant's contention that he is not an oncologist and would not be allowed to administer prostate cancer treatment such as radiation or surgery. The fact that plaintiff was referred to a specialist and later to oncology supports defendant Mehta's position that he personally would not have performed such cancer treatment in any event.  On this record, defendant Mehta is entitled to summary judgment.

For all of the foregoing reasons, this court finds that there is no triable issue of material fact as to whether defendant Mehta acted with deliberate indifference to plaintiff's serious medical needs, and this court further finds that defendant Mehta is entitled to summary judgment on plaintiff's Eighth Amendment claim.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Defendant' January 20, 2006 motion for summary judgment be granted;

2. This action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised

---

[11]  The court also notes that once plaintiff had a falling out with Dr. Athanassious, he was referred to outside consultants and oncology.  It appears plaintiff's initial refusal to have the surgery may have stemmed from his difficulties with communication based on his loss of hearing.  But plaintiff refused the surgery on July 28, 2003, when Dr. Athanassious explained the risks and benefits of the surgery through an interpreter.  In addition, he refused again in 2004, when outside physician Dr. Masters explained the procedure in detail.  These refusals could well be based on complications or risks rather than plaintiff's disagreement with a treating doctor.

14

1  that failure to file objections within the specified time may waive the right to appeal the District
2  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
3  DATED: June 15, 2006.

_____<br>UNITED STATES MAGISTRATE JUDGE

7  001; rang1633.msj