1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROGELIO HAMILTON RANGEL,

11              Plaintiff,                    No. CIV S-02-1633 GEB EFB P

12        vs.

13   ATHANASSIOUS, et al.,
                                             ORDER AND
14              Defendants.                  FINDINGS AND RECOMMENDATIONS

15   _____/

16        Plaintiff is a state prisoner proceeding with counsel in a civil rights action brought under

17   42 U.S.C. § 1983.  This action proceeds on plaintiff's March 3, 2011 Fourth Amended

18   Complaint, which alleges Eighth Amendment claims against defendants Athanassious,

19   Andreason and Bick ("defendants"), based on their alleged failure to treat or remove plaintiff's

20   enlarged and/or cancerous prostate.  Defendants move for summary judgment.  Plaintiff opposes

21   the motion and defendants have filed a reply. The hearing on defendants' motion is currently set

22   for October 26, 2011.  Because the undersigned has determined that oral argument will not

23   materially assist in resolving the motion, the October 26 hearing is vacated pursuant to Local

24   Rule 230(g).  Additionally, for the reasons stated below, the undersigned recommends that the

25   motion be granted.

26   ////

1

## I.       Background

Unless otherwise noted, the court finds that the following facts are not disputed by the parties or following the court's review of the evidence submitted, have been determined to be undisputed.

On March 18, 1999, Dr. Wang took a needle biopsy of plaintiff's prostate.  Defs.' Mot. for Summ. J. ("Defs.' MSJ"), Athanassious Dep. ("Athanassious Dep."), Exs. 1, 3; Pl.'s Opp'n, Stmt. of Genuine Issues in Supp. Thereof ("Pl.'s Stmt.") 1-5 (citing Athanassious Dep., Exs. 1, 2).  The parties agree the pathology report indicated no cancer.  Defs.' MSJ, Mem. of P. & A. in Supp. Thereof ("Defs.' P. & A.") at 9; Pl.'s Opp'n, Mem. of P. & A. in Supp. Thereof ("Pl.'s P. & A.") at 1.

On July 31, 2001, plaintiff consented to defendant Dr. Athanassious performing a cystoscopy and another needle biopsy of plaintiff's prostate.  Athanassious Dep., Ex. 10; Pl.'s Stmt. 1-5 (citing Athanassious Dep., Ex. 10).  The parties agree that the cystoscopy and needle biopsy indicated no cancer.  Defs.' P. & A. at 9; Athanassious Dep. at 155:7-8, Exs. 12, 13; Pl.'s P & A. at 1.

At some point in time, plaintiff was provided with a Foley catheter.  *See* Athanassious Dep., Ex. 14; Defs.' MSJ, Stmt. of Undisp. Facts in Supp. Thereof ("Defs.' Stmt.") 1-3; Pl.'s Stmt. 1-3.  A Foley catheter, by itself, can be an adequate medical treatment for an enlarged prostate, but sometimes it is only a temporary treatment that is used until a procedure such as a transurethral resection of the prostate, also known as a "TURP," is performed.  Defs.' MSJ, Bick Dep. ("Bick Dep.") at 176:9-177:1; *see also* Defs.' Stmt. 1-3; Pl.'s Stmt. 1-3.  The treatment for urinary retention varies if the patient also has prostate cancer.  Athanassious Dep., Ex. 45.  A TURP is not a treatment for cancer.  Bick Dep. at 52:15-17.  Performing a TURP on someone with prostate cancer could cause the disease to spread.  Bick Dep. at 111:19-112:6.

////

////

1    On two occasions before August 17, 2001, plaintiff tried to have his Foley catheter

2    removed, but in each instance, the catheter had to be reinserted because plaintiff was retaining

3    urine.  Athanassious Dep., Ex. 14; Defs.' Stmt. 1-4; Pl.'s Stmt. 1-4.

4         By August 17, 2001, plaintiff had been prescribed progressively increasing doses of an

5    alpha blocker, terazosin, to treat what Dr. Mehta had noted was not cancer, but rather, prostatic

6    hypertrophy.  Athanassious Dep., Ex. 14; Defs.' Stmt. 1-2; Pl.'s Stmt. 1-2.  Terazosin relaxes the

7    capsule of the prostate gland, with the goal of opening the urethra and relieving the patient's

8    inability to urinate.  Pl.'s Stmt. 1-2.  An alpha blocker such as terazosin may be used instead of a

9    prostatectomy or a TURP, to relieve one's inability to urinate.  *Id.*

10        On January 2, 2002, Dr. Athanassious performed another cystoscopy on plaintiff, which

11   indicated plaintiff had  "retention of urine secondary to benign prostatic hypertrophy."

12   Athanassious Dep., Ex. 17, 18; Pl.'s Stmt. 1-5 (citing Bick Dep., Ex. 17).  At his deposition, Dr.

13   Athanassious testified that several days after this cystoscopy, he explained to plaintiff that

14   plaintiff's prostate gland prevented him from urinating, and plaintiff agreed to have his prostate

15   gland removed.  Athanassious Dep. at 53:16-54:14.  Medical records from that time period,

16   however, reflect that plaintiff agreed and was scheduled instead, for a TURP.  Bick Dep., Exs.

17   15, 18-2, 19, 20, 21, 22, 24, 26; Pl.'s P. & A. at 2.  Dr. Athanassious testified at his deposition

18   that he arranged for plaintiff's admission to the prison hospital and put him on the operating

19   room list.  Athanassious Dep. at 58:5-7.  Dr. Athanassious further testified that plaintiff did not

20   show up for his scheduled surgery.  *Id.* at 54:22-23, 55:3, 57:1-2, 58:7, 63:21; Pl.'s Stmt. 3-3.  A

21   January 14, 2002 medical record includes the following notation:

22        Utilization MGT- CMF
          Discussed proposed TURP (per Dr. Athanassious) [with] Dr. Andreason, CMO-
23        CMF this date.  Procedure Ø approved.  Dr. Andreason desires to discuss case w/
          Dr. Athanassious.  Dr. Andreason stated will try to go over case tomorrow,
24        1/15/02.

25   Bick Dep., Ex. 27.  According to defendants, this notation shows that the Utilization

26   Management Committee denied the TURP.  Defs.' Stmt. 3-3.  According to plaintiff, this

notation shows that defendant Dr. Andreason denied the TURP.  Pl.'s Stmt. 3-3.  Dr.

Athanassious testified that a treating physician's request for surgery must be approved first by a

Chief Medical Officer, then by the Utilization Management Committee, before the patient is

placed on the operating room list.  *Id.*  According to Dr. Athanassious, the Chief Medical Officer

did not approve plaintiff's TURP.  *Id.*

Defendants Dr. Andreason and Dr. Bick, as chief medical officers, were not treating

physicians and did not personally participate in plaintiff's daily care or treatment.  Defs.' Stmt.

3-2.  They did, however, have access to plaintiff's medical file, and could grant or deny a

treating physician's request for a TURP.  Pl.'s Stmt. 3-2.

Two weeks after the TURP was denied, Dr. Athanassious ordered a repeat bone scan for

plaintiff.  Athanassious Dep. at 70:11-14, Ex. 21.  Plaintiff had a bone scan in July 2001, but Dr.

Athanassious testified he wanted to rule out any possibility of cancer.  *Id.* at 71:2-4.  The Chief

Medical Officer approved the scan and plaintiff attended it willingly on January 28, 2002.  *Id.* at

71:5-7, 71:20-24; Pl.'s Stmt. 1-5.

On April 11, 2002, plaintiff filed an administrative appeal stating he had cancer, and

requesting that he "be given effective treatment through surgery or radiation to eliminate the

occasional and necessary insertion of a Foley catheter . . . ."  Bick Dep., Ex 30-2.  In his May 6,

2002 denial of the appeal, Dr. Bick acknowledged plaintiff's request, but denied it, noting

plaintiff's recent "negative biopsy," "stable PSA," and upcoming appointment with Dr.

Richman, an oncologist.  *Id.*, Ex. 30-1.

When Dr. Bick reviewed the administrative appeal at his deposition, he did not remember

having any questions or concerns about a TURP at that time.  *Id.* at 82:22-24.  Dr. Bick testified

that when he denied plaintiff's appeal, he did not know that the TURP proposed by Dr.

Athanassious had been disapproved.  *Id.* at 86:7-12.  Dr. Bick also testified he did not

communicate to plaintiff how plaintiff could get his Foley catheter removed or relieve his urine

blockage even if he did not have cancer.  *Id.* at 83:7-14.

On August 20, 2002, Dr. Bick sent a request by Dr. Richman for a TURP for plaintiff to "utilization review."[1] *Id.* at 109:1-23, Ex. 32. On September 24, 2002, Dr. Bick forwarded another request, again by Dr. Richman, "to get rid of the Foley." *Id.* at 112:8-22, Ex. 35. Dr. Bick forwarded Dr. Richman's third request for a TURP for plaintiff on January 7, 2003. *Id.* at 115:5-13, Ex. 36. Dr. Bick testified that when he signed off on Dr. Richman's third request, it probably did not register to him that the same clinician was requesting the same procedure for the same patient, and he did not recall conferring with Dr. Richman about the requests. *Id.* at 118:3-20. Dr. Bick also testified that he does not think he has ever had a conversation with plaintiff and does not know whether plaintiff ever received a TURP. *Id.* at 173:19, 120:20.

A February 3, 2003 medical record indicates that plaintiff refused the TURP that Dr. Richman had requested on January 7, 2003.[2] Athanassious Dep., Ex. 25. In another medical record dated February 3, 2003, medical technical assistant Felix noted that plaintiff refused to have "prostate surgery to remove prostate gland or TURP." *Id.*, Ex. 46. Dr. Athanassious also testified that plaintiff came to the clinic on February 3, 2003 but refused to have a TURP. *Id.* at 80:10.

Thereafter, plaintiff continued to refuse medical tests and procedures related to his prostate condition. Defs.' Stmt. 1-5; Defs.' P. & A. at 6; Pl.'s P. & A. at 4. On June 2, 2003, a medical technical assistant noted that plaintiff refused to have "prostate surgery and biopsy," including a "TURP." Athanassious Dep., Exs. 47, 48. On July 28, 2003, a medical technical assistant noted that plaintiff refused a "cysto and needle biopsy of the prostate." *Id.*, Ex. 49. On November 21, 2003, plaintiff apparently refused prostate surgery because he did "not want prostate surgery done at CMF." *Id.*, Ex. 50. On March 2, 2004, medical technical assistant

---

[1] "Utilization review" appears to refer to the Utilization Management Committee.

[2] Plaintiff asserts that he agreed to a TURP on numerous dates, including January 6, 2003, January 31, 2003, February 3, 2003, February 18, 2003, March 19, 2003, July 8, 2003 and November 10, 2003. Pl.'s Stmt. 1-5. However, plaintiff's cited evidence does not support this statement.

1  Huliganga noted that plaintiff refused a "transrectal ultrasound of the prostate and ultrasound
2  guided prostate biopsy" offered by Dr. Masters of the University of California, San Francisco
3  ("UCSF"). *Id.*, Ex. 51.  On August 5, 2005, a medical technical assistant noted that plaintiff
4  again refused a "prostate biopsy" at UCSF. *Id.*, Ex. 52.  On May 26, 2006, a medical technical
5  assistant noted plaintiff refused unspecified prostate treatment because he "wanted to be seen
6  regarding [his] prostate" at UCSF. *Id.*, Ex. 53.  On December 1, 2006, a medical technical
7  assistant noted plaintiff refused a  "biopsy of prostate." *Id.*, Ex. 54.  On March 9, 2007, it is
8  noted that plaintiff refused a "current biopsy."  *Id.*., Ex. 82.  On March 23, 2007, medical
9  technical assistant Reed noted plaintiff refused a prostate biopsy. *Id.*, Ex. 83. On April 19, 2007,
10  it is noted that plaintiff refused a "cystoscopy with needle prostate biopsy by Dr. Athanassious."[3]
11  *Id.*, Ex. 84.

12      A December 16, 2009, medical report by Dr. Khaira states that plaintiff "insists . . . he
13  has prostate cancer presently but to my knowledge there is no evidence of that being diagnosed
14  or treated," as plaintiff has "previously undergone evaluation for prostate cancer, which was
15  negative."  *Id.*, Ex. 80-1; *see also* Pl.'s Stmt. 1-5 (citing Athanassious Dep., Ex. 80).

16      A June 4, 2010 medical report by Dr. Khaira found that plaintiff had "chronic urinary
17  retention" and "benign prostatic hypertrophy."  Athanassious Dep., Ex. 82-1.

18      To the best of defendants' knowledge, plaintiff has never had cancer.  Defs.' Stmt. 1-1.

19  **II.   Summary Judgment Standards**

20       Summary judgment is appropriate when there is "no genuine dispute as to any material
21  fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary
22  judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant

23
24          [3]Plaintiff asserts that defendants never had plaintiff evaluated by a psychiatrist or
    psychologist to determine whether he was mentally competent at the times he refused repeated
    biopsies and cystoscopies.  Pl.'s Stmt. 1-5.  However, plaintiff's cited evidence shows that Dr.
25  Andreason requested such services for plaintiff on December 2, 2006, and that the assigned
    consultant found that plaintiff did not exhibit any psychiatric symptoms or limitations.  *See*
26  Athanassious Dep., Ex. 61.

to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. *Celotex Cop. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson.*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures. Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own. When the opposing party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim. *See e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 323-24 (1986). ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

1   issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

2   depositions, answers to interrogatories, and admissions on file.'").  Indeed, summary judgment

3   should be entered, after adequate time for discovery and upon motion, against a party who fails

4   to make a showing sufficient to establish the existence of an element essential to that party's

5   case, and on which that party will bear the burden of proof at trial.  *See id.* at 322.  In such a

6   circumstance, summary judgment must be granted, "so long as whatever is before the district

7   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

8   satisfied."  *Id.* at 323.

9        To defeat summary judgment the opposing party must establish a genuine dispute as to a

10   material issue of fact.  This entails two requirements.  First, the dispute must be over a fact(s)

11   that is material, i.e., one that makes a difference in the outcome of the case.  *Anderson*, 477 U.S.

12   at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing

13   law will properly preclude the entry of summary judgment.").  Whether a factual dispute is

14   material is determined by the substantive law, *id.*, which here involves an Eighth Amendment

15   claim that the defendants failed to treat or remove plaintiff's enlarged and/or cancerous prostate.

16   If the opposing party is unable to produce evidence sufficient to establish a required element of

17   its claim that party fails in opposing summary judgment.  "[A] complete failure of proof

18   concerning an essential element of the nonmoving party's case necessarily renders all other facts

19   immaterial."  *Celotex*, 477 U.S. at 322.

20       Second, the dispute must be genuine.  In determining whether a factual dispute is genuine

21   the court must again focus on which party bears the burden of proof on the factual issue in

22   question.  Where the party opposing summary judgment would bear the burden of proof at trial

23   on the factual issue in dispute, that party must produce evidence sufficient to support its factual

24   claim.  Conclusory allegations, unsupported by evidence are insufficient to defeat the motion.

25   *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).  Rather, the opposing party must, by affidavit

26   or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue

8

for trial. *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076. More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 248, 252. Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility. It believes the opposing party's evidence, and draws inferences most favorably for the opposing party. *See id.* at 249, 255; *Matsushita*, 475 U.S. at 587. Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences. *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322). If reasonable minds could differ on material facts at issue, summary judgment is inappropriate. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). On the other hand,"[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). In that case, the court must grant summary judgment.

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* If the evidence presented and any reasonable inferences that might be drawn from it could not support a judgment in favor of the opposing party, there is no genuine issue. *Celotex.*, 477 U.S. at 323. Thus, Rule 56 serves to screen cases lacking any genuine dispute over an issue that is determinative of the outcome of the case.

**III.    Legal Standard for Eighth Amendment Claim Pursuant to 42 U.S.C. § 1983**

Under 42 U.S.C. § 1983, plaintiff must show: (1) the violation of a federal constitutional or statutory right; and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). An individual defendant is not liable on a civil rights claim unless the facts establish

9

the defendant's personal involvement in the alleged rights deprivation, as there is no respondeat

superior liability under section 1983. *Jones*, 297 F.3d at 934.  That is, plaintiff may not sue any

official on the theory that the official is liable for the unconstitutional conduct of his or her

subordinates. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).   Because respondeat superior

liability is inapplicable to § 1983 suits, "a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution." *Id.*   To

be held liable, "the supervisor need not be directly and personally involved in the same way as

are the individual officers who are on the scene inflicting constitutional injury." *Starr v. Baca*,

__ F.3d __, 2011 U.S. App. LEXIS 15283, at *6 (9th Cir. 2011) (quotations omitted).  Rather,

the supervisor's participation and resulting liability could be based upon the supervisor's

knowledge of and acquiescence in unconstitutional conduct by others.  *Id.*

        To state a section 1983 claim for violation of the Eighth Amendment based on inadequate

medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  To prevail,

plaintiff must show both that his medical needs were objectively serious, and that defendant

possessed a sufficiently culpable state of mind.  *Wilson v. Seiter*, 501 U.S. 294, 297-99 (1991);

*McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992).   A serious medical need is one that

significantly affects an individual's daily activities, an injury or condition a reasonable doctor or

patient would find worthy of comment or treatment, or the existence of chronic and substantial

pain.  *See*, *e.g.*, *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other*

*grounds by WMX Techs. v. Miller*, 104 F.2d 1133, 1136 (9th Cir.1997) (*en banc*).

        Deliberate indifference may be shown by the denial, delay or intentional interference

with medical treatment or by the way in which medical care is provided.  *Hutchinson v. United*

*States*, 838 F.2d 390, 394 (9th Cir. 1988).  To act with deliberate indifference, a prison official

must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference.  *Farmer v. Brennan*, 511 U.S. 825, 837

10

1    (1994).  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious

2    harm and disregards that risk by failing to take reasonable measures to abate it."  *Id.* at 847.  "[I]t

3    is enough that the official acted or failed to act despite his knowledge of a substantial risk of

4    serious harm."  *Id.* at 842.  A physician need not fail to treat an inmate altogether in order to

5    violate that inmate's Eighth Amendment rights.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314

6    (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some

7    treatment is prescribed, may constitute deliberate indifference in a particular case.  *Id.*  However,

8    it is important to differentiate common law negligence claims of malpractice from claims

9    predicated on violations of the Eight Amendment's prohibition of cruel and unusual punishment.

10   In asserting the latter, "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not

11   support this cause of action."  *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.

12   1980) (citing *Estelle*, 429 U.S. at 105-06); *see also Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th

13   Cir. 2004).   It is well established that mere differences of opinion concerning the appropriate

14   treatment cannot be the basis of an Eighth Amendment violation.  *Jackson v. McIntosh*, 90 F.3d

15   330, 332 (9th Cir. 1996); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

16   **IV.   Discussion**

17          Defendants contend they are entitled to judgment as a matter of law.  They rely on

18   objective evidence showing that plaintiff has received extensive medical care and treatment for

19   all of his health conditions, and contend that plaintiff lacks evidence to establish they were

20   deliberately indifferent to his medical needs or that he suffered any injury or harm as a result of

21   the alleged conduct.[4]  Defs.' P. & A. at 7.  Indeed, as discussed below, the court finds that there

22   simply is no evidence to establish a genuine issue of fact as to whether any defendant acted with

23

24          [4] Defendants also contend that plaintiff's claims against Dr. Bick and Dr. Andreason
     should be dismissed as either barred by the statute of limitations or because they have been
25   named in their official capacities only, and are therefore not "persons" within the meaning of 42
     U.S.C. § 1983.  Defs.' P. & A. at 7.  Because the court finds defendants are entitled to summary
26   judgment on alternate grounds, these issues need not be addressed.

11

1  the requisite deliberate indifference for an Eighth Amendment claim.  Viewing the evidence in

2  the light most favorable to plaintiff as the non-moving party, the undersigned finds that no

3  reasonable juror could conclude that any of the defendants knew of and disregarded an excessive

4  risk to plaintiff's health.

5          Plaintiff has an enlarged prostate, but to the best of defendants' knowledge, he does not

6  have cancer.  Defs.' Stmt. 1-1, 1-2.  It is apparent from the medical records that plaintiff has

7  disagreed with the medical findings in that regard, but his quarrel is with the medical diagnosis

8  and prescribed manner of treatment and not with whether defendants were deliberately

9  indifferent to his medical needs.  As for plaintiff's treatment, as chief medical officers, neither

10 Dr. Bick nor Dr. Andreason personally participated in plaintiff's daily care or treatment.  *Id.* at 3-

11 2.  However, the medical records show plaintiff was prescribed terazosin and was given a Foley

12 catheter for his enlarged prostate.  *Id.* at 1-2, 1-3.  On several occasions, defendants tried to make

13 plaintiff more comfortable by removing the catheter.  *Id.* at 1-4.  However, plaintiff experienced

14 complications both times the catheter was removed, requiring that it be reinserted.  *Id.*  From

15 2003 through 2007, plaintiff repeatedly refused to accept care and treatment or further diagnostic

16 testing for his prostate condition.  *Id.* at 1-5; Defs.' P. & A. at 6.  The treatment for urinary

17 retention varies if the patient also has prostate cancer and performing a TURP on someone with

18 prostate cancer could cause the disease to spread.  Athanassious Dep., Ex. 45; Bick Dep. at

19 111:19-112:6; *see also* Defs.' P. & A. at 5-6.  Thus, defendants contend they were unable to fully

20 address plaintiff's medical condition because plaintiff was refusing the medical services offered

21 to him.  Defs.' P. & A. at 6, 9-10.

22         Plaintiff contends that several facts are in dispute, but those disputes do not create any

23 triable issues of material fact.  According to plaintiff, Dr. Athanassious has not been able to rule

24 ////

25 ////

26 ////

out cancer.[5]  Pl.'s Stmt. 1-1.  However, it does not follow from this that any defendant knew of

and consciously disregarded the risk that plaintiff could have cancer.  Plaintiff's cited evidence

demonstrates that where prostate cancer is suspected, current biopsies or cystoscopies are needed

in order to diagnose it or rule it out, as performing either a TURP or a prostatectomy on a patient

with cancer could be harmful to the patient.  *See id*.  As the record reflects, plaintiff repeatedly

refused to consent to such diagnostic tests.

        Plaintiff also cites to several medical chronos,[6] including an August 1, 2006 chrono

signed by Dr. Bick, which noted that plaintiff has "advanced prostate cancer with urinary

obstruction," among other medical problems, and recommended that plaintiff be given an

elevator pass, use of a cane, and lower bunk housing.  Pl.'s P. & A. at 5; Bick Dep., Ex. 53.  Dr.

Athanassious testified that such chronos are not "treatment chronos," as they are issued based

upon what the patient reports, as opposed to a proven diagnosis.  Athanassious Dep. at 142:2-23.

Further, it remains undisputed that the biopsies and tests performed as recently as December

2009 and June 2010, confirmed that plaintiff does not have cancer.  Pl.'s P. & A. at 5;

Athanassious Dep., Ex. 82-1.  Assuming one could reasonably infer from the chrono that Dr.

Bick knew or suspected plaintiff had cancer in 2006, there is no evidence that Dr. Bick ignored

the issue or responded to that medical need with deliberate indifference.  Rather, the record

reflects that in 2006 and 2007 plaintiff continued to refuse the medical procedures offered to

him.  Defs.' Stmt. 1-5.  Plaintiff points to no evidence showing that the medical procedures

offered were inadequate, let alone chosen in a conscious disregard for plaintiff's health.

---

        [5] In support of this statement, plaintiff cites to Exhibit 12 of the Athanassious Deposition, which documents an August 2001 postoperative diagnosis of "cancer of the prostate gland." Pl.'s Stmt. 1-1.  Defendants submit undisputed evidence that the "postoperative diagnosis" box on that document was filled in before the sample was actually submitted for testing, and that subsequent test results showed that plaintiff did not have cancer.  *See* Defs.' P. & A. at 4-5 (citing Athanassious Dep. at 154:14-22, 155:7-8, Ex. 13); *see also* Pl.'s Stmt. 1-1 (citing Athanassious Dep. at 154:2-155:8).

        [6] A chrono is a form that "is used to document information about inmates and inmate behavior."  Cal. Code Regs. tit. 15, § 3000.

1    Plaintiff asserts that the Foley catheter was neither reasonable nor appropriate given his

2    numerous requests for a TURP to relieve his blockage and defendants' repeated denials of those

3    requests.  Pl.'s Stmt. 1-3.  Plaintiff also contends he wanted surgery instead of diagnostic testing.

4    Pl.'s P. & A. at 5; Pl.'s Stmt. 1-5.  However, evidence that plaintiff wanted a certain type of

5    medical care does not show that the care actually provided or offered to plaintiff was

6    unreasonable or inappropriate.  Plaintiff's opinion as to what constituted proper medical care

7    does not create a triable issue to defeat summary judgment.  *Estelle*, 429 U.S. at 106.

8    Plaintiff also contends defendants were deliberately indifferent through their "consistent

9    inaction," in that they (1) refused to operate on plaintiff's prostate to correct his chronic inability

10   to urinate, (2) failed to explain to plaintiff why his requests for a TURP kept getting denied, or

11   why, instead of a TURP, he was asked to submit to more biopsies and cystoscopies, (3) denied

12   plaintiff's administrative appeal seeking relief from the Foley catheter, and (4) allowed the

13   Utilization Management Committee to ignore Dr. Richman's requests that plaintiff receive a

14   TURP.  Pl.'s P. & A. at 6-7.

15   Plaintiff's evidence shows that Dr. Athanassious scheduled plaintiff for a TURP on

16   January 14, 2002, and that Dr. Andreason may have been responsible for cancelling that surgery.

17   Pl.'s Stmt. 3-3.  At most, however, this evidence establishes a difference of opinion between Dr.

18   Athanassious and Dr. Andreason regarding whether plaintiff needed a TURP in 2002.  Evidence

19   that medical caregivers disagreed as to the need to pursue one course of treatment over another is

20   insufficient, by itself, to establish deliberate indifference.  *Jackson*, 90 F.3d at 332.  While

21   plaintiff also points to Dr. Bick's testimony that a Foley catheter is sometimes used only as a

22   temporary measure until a TURP can be performed, it does not follow from that testimony that in

23   disapproving of a TURP for plaintiff in 2002, Dr. Andreason demonstrated a conscious disregard

24   of an excessive risk to plaintiff's health.  *See* Pl.'s Stmt. 1-3.  Moreover, there is no evidence that

25   the Foley catheter should have been used only as a temporary measure in plaintiff's case.

26   ////

14

1    Plaintiff also states that defendants failed to explain to him why his requests for a TURP

2    kept getting denied, or why, instead of a TURP, he was asked to submit to more biopsies and

3    cystoscopies.  Pl.'s P. & A. at 6; Pl.'s Stmt. 1-5, Issue No. 1. However, the evidence plaintiff

4    cites does not support this statement.

5    Plaintiff refers to Dr. Athanassious' testimony, which states only that Dr. Athanassious

6    does not remember whether he discussed with plaintiff the 2002 TURP that never occurred.  *See*

7    Pl.'s Stmt., Issue No. 1 (citing Athanassious Dep. at 76:5-7).  Plaintiff also refers to Dr. Bick's

8    testimony, which states that he does not think he has ever had a conversation with plaintiff.  *Id.*

9    (citing Bick Dep. at 173:19).  Plaintiff's own evidence, however, demonstrates that Dr. Bick

10   communicated with plaintiff in writing through the administrative appeal process.  At his

11   deposition, Dr. Bick testified that when he responded to plaintiff's administrative appeal in 2003

12   regarding plaintiff's Foley catheter, he did not remember having any questions or concerns about

13   a TURP at that time, because there was nothing in plaintiff's appeal regarding a TURP.  *See* Pl.'s

14   P. & A. at 4 (citing Bick Dep. at 82:22-24); *see also* Bick Dep., Ex. 30.  Plaintiff does not argue

15   or point to any evidence suggesting why Dr. Bick, who was not plaintiff's treating physician,

16   should have explained to plaintiff why the 2002 TURP was denied, or why Dr. Bick's failure to

17   do so would amount to deliberate indifference to plaintiff's medical needs.

18   As to the issue regarding whether defendants explained to plaintiff the need for additional

19   biopsies, plaintiff first cites to a June 2, 2003 handwritten medical record stamped with the name

20   of Dr. Athanassious.  Athanassious Dep., Ex. 32.  The record appears to note that (1) plaintiff

21   previously refused a TURP, (2) plaintiff and the doctor spoke through an interpreter, (3) plaintiff

22   was informed that the pathology report dated August 7, 2001 was negative for cancer, (4)

23   plaintiff refused a TURP, (5) the risks of surgery were explained to plaintiff, and (5) that a

24   cystoscopy and "NBP," would be repeated.  *Id.*  Plaintiff then cites to another medical record

25   stamped with the name of Dr. Athanassious, which indicates that plaintiff refused "cysy" and

26   "NB pstate," that surgery for "BPH" was explained, including a TURP, but that plaintiff "still

15

refused." *Id.*, Ex. 33.  Next, plaintiff cites to a July 8, 2003 request for consulting services from a urologist at California Medical Facility. *Id.*, Ex. 34.  The request states that the patient, plaintiff, refused treatment on June 2, 2003 "for prostate surgery & biopsy, then filed an appeal stating he does not understand what was explained to him . . . . .  Please reiterate to [patient] his needs & risks re: prostate surgery/biopsy."[7]  *Id.*  The "consultant section" of the same document is dated July 28, 2003, and is stamped "R. Andreasen, M.D. Chief Medical Officer."  *Id.*  To the extent legible, it states that the patient, "through [an] interpreter was infor[med] about need for repeat cysto & needle biopsy of prostate gland[,] he refused[,] explained to the patient options [for] a large prostate gland including TURP and open [ ] prostatectomy[,] explain[ed] inform[ed] consent . . .  with [patient, patient] refused."  *Id.*

At a minimum, plaintiff's cited evidence suggests that as of July 28, 2003, Dr. Andreason informed plaintiff, who had already refused one or more TURPs, about why plaintiff needed to submit to a biopsy and cystoscopy.  Plaintiff cites to evidence that in 2004 and 2006, he still had questions about why he was being asked to submit to another biopsy.  Pl.'s Stmt. 1-5 (citing Athanassious Dep., Exs. 42, 61), Issue No. 1 (citing Athanassious Dep., Ex. 54).  However, the cited evidence does not indicate whether those questions were directed to any of the defendants, and if so, how any defendant responded to those questions.

Additionally, plaintiff has not demonstrated that Dr. Bick consciously disregarded any substantial risk to plaintiff's health when he denied plaintiff's administrative appeal in May of 2002.  Plaintiff contends Dr. Bick should have provided plaintiff relief from the Foley catheter, but instead denied plaintiff's appeal on the grounds plaintiff had misdiagnosed himself as suffering from cancer.  Pl.'s P. & A. at 6.  It is evident from plaintiff's administrative appeal that

---

[7] Plaintiff also cites to the referenced administrative appeal.  Pl.'s Stmt. 1-5 (citing Bick Dep., Ex. 37).  It shows that Dr. Andreason responded to the appeal at the first level of review on July 9, 2003, and that Dr. Bick responded to the appeal at the second level of review on September 23, 2003.  Bick Dep., Ex. 37.  The substance of Bick's response, however, is not included in the exhibit.

he sought relief from the Foley catheter, but again, plaintiff's disagreement as to what was or was not proper medical care, does not create a triable issue. *See Estelle*, 429 U.S. at 106. Aside from plaintiff's complaints about his medical care, plaintiff cites to no evidence suggesting that he should have been relieved of the catheter. Pl.'s Stmt. 1-3. Moreover, in denying plaintiff's administrative appeal, Dr. Bick noted that plaintiff had recently received medical care related to his prostate condition from Dr. Richman, and that plaintiff was scheduled for a follow up appointment with Dr. Richman later in the month. Bick Dep., Ex. 30. Plaintiff has not shown that Dr. Bick's denial of his administrative appeal demonstrated a conscious disregard for plaintiff's health.

Plaintiff also states that defendants "idly allowed" the Utilization Management Committee to ignore three requests by Dr. Richman for a TURP. Pl.'s P. & A. at 6. The evidence offered in support of this statement shows that Dr. Bick forwarded Dr. Richman's TURP requests to the Utilization Management Committee. Pl.'s Stmt., Issue No. 2. The record reflects that after the third request, plaintiff was scheduled for a TURP, but that plaintiff refused it. Bick Dep. at 115:5-13, Ex. 36; Athanassious Dep. at 80:10, Exs. 25, 46. Assuming Dr. Bick should have investigated or questioned why plaintiff had not received a TURP after the first or second request, plaintiff fails to demonstrate how this harmed him. At worst, Dr. Bick's failure in this regard resulted in a several month delay between when Dr. Richman's first request was forwarded on August 20, 2002, until plaintiff was scheduled for a TURP on February 3, 2003, following Dr. Richman's third request. Bick Dep. at 109:1-23, Ex. 32; Athanassious Dep. at 80:10, Ex. 25, 46. But a delay in medical care, without harm, is insufficient to demonstrate deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam). Although plaintiff did not actually receive a TURP on February 3, 2003, plaintiff has not shown any defendant is to blame for this. Nor has plaintiff shown any defendant is to blame for the surgeries plaintiff refused on June 2, 2003 or November 21, 2003. *See* Athanassious Dep. at 80:10, Exs. 25, 46, 47, 48, 50.

1        Lastly, plaintiff contends that defendants' deliberate indifference has caused harm to

2   plaintiff because by 2007, the TURP that had been denied in 2002 and 2003 was no longer

3   feasible due to plaintiff's advancing age and heart disease.  Pl.'s Stmt., Issue No. 3.  As

4   discussed above, however, plaintiff has not shown that plaintiff's failure to receive a TURP was

5   the result of defendants' deliberate indifference.

6        The evidence establishes that plaintiff was provided with medical care to treat his

7   prostate condition.  In addition to the terazosin and the catheter, medical staff frequently tried to

8   monitor plaintiff's prostate condition from 1999 through 2010.  Plaintiff has failed to present any

9   evidence that the treatment he was provided was constitutionally deficient or that he suffered any

10  injury as a result of defendants' acts or omissions.  When the evidence is viewed in the light

11  most favorable to plaintiff, and reasonable inferences are drawn in his favor, no reasonable jury

12  could return a verdict for him and against defendants.  Defendants are therefore entitled to

13  judgment as a matter of law.

14  **VI.   Conclusion**

15       Accordingly, IT IS HEREBY ORDERED that the October 26, 2011 hearing on

16  defendants' motion for summary judgment, and the November 16, 2011 pretrial conference, are

17  vacated.[8]

18       Further, IT IS HEREBY RECOMMENDED that:

19       1.  Defendants' August 17, 2011 motion for summary judgment be granted;

20       2.  The Clerk be directed to enter judgment in defendants' favors; and

21  ////

22  ////

23  ////

24

25     [8] As a result, the parties are not required to submit a joint pretrial statement as provided in the June 22, 2010 order.  *See* Dckt. No. 119.  However, if the recommendation herein is not adopted by the district judge, the undersigned will reschedule the pretrial conference and require

26  the parties to submit a joint pretrial statement.

3.  The Clerk be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  October 20, 2011.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

.